Sosman, J.
The Commonwealth has brought the present action against various tobacco manufacturers, distributors and industry associations seeking to recover for health care costs allegedly incurred on account of defendants’ tortious conduct. Also named as a defendant is B.A.T. Industries p.l.c., a British holding company with numerous tobacco subsidiaries (including defendant Brown & Williamson Tobacco Corporation). B.A.T. Industries p.l.c. has moved to dismiss the complaint against it for lack of personal jurisdiction. For the following reasons, the motion is DENIED.
Allegations in the Amended Complaint
The Commonwealth’s amended complaint alleges various forms of misconduct by the tobacco industry defendants. The Commonwealth first complains that the tobacco industry deliberately withheld and suppressed information regarding the health consequences of cigarette smoking and misled the public with respect to the hazards of the product. The Commonwealth also complains about the design of the product itself, alleging that the tobacco industry deliberately refrained from making a “safer” cigarette and that the tobacco industry intentionally designed cigarettes to make them more addictive, by increasing the amount of nicotine in the tobacco itself and/or by using additives that enhance the delivery of nicotine to the smoker.
The Commonwealth alleges that B.A.T. Industries p.l.c. directed its subsidiaries to commit the torts that are the subject of this lawsuit. It claims that B.A.T. Industries p.l.c. did not act merely as a passive holding company but that, with respect to these particular issues, instructed its subsidiaries to suppress research, to mislead the public about the health effects of smoking, to design a more addictive product, and not to design a “safer” product. The Commonwealth also alleges that the various defendants, including B.A.T. Industries p.l.c., acted in concert with respect to suppressing information about the health risks of cigarette smoking.
The Commonwealth claims that this'misconduct by the defendants has caused it to expend billions of dollars to treat Medicaid patients for their smoking related illnesses. It seeks to recover for those alleged increased Medicaid payments and also seeks various forms of injunctive relief to address the alleged “public health crisis” occasioned by cigarette smoking.
Facts
1. B.A.T. Industries p.l.c.’s Massachusetts Contacts
B.A.T. Industries p.l.c. is a British holding company with over 500 subsidiaries worldwide, many of which manufacture and sell cigarettes. B.A.T. Industries p.l.c. itself does not manufacture or distribute tobacco products. All of the manufacturing, distributing, marketing and advertising of cigarettes is carried on by its various subsidiaries. One of its subsidiaries is defendant Brown & Williamson Tobacco Corporation (“B&W”), an American tobacco company that manufactures, distributes, and markets cigarettes throughout the United States. B&W has a significant share of the cigarette market in Massachusetts, and returns significant dividends to B.A.T. Industries p.l.c., based in part on revenues from cigarette sales in Massachusetts.
B.A.T. Industries p.l.c.’s offices are located in London. It does not have any offices in Massachusetts. It does not own or possess any property in Massachusetts. No phone numbers are listed in Massachusetts for B.A.T. Industries p.l.c. B.A.T. Industries p.l.c. does not pay taxes in Massachusetts.
Representatives of B.A.T. Industries p.l.c. have come to Massachusetts for purposes of promoting investment in its companies. Several of its largest institutional investors are located in Massachusetts, and B.A.T. Industries p.l.c. Board members (including the Chairman of the Board) have come to Boston periodically to meet with those investors and other potential investors.
*236 II. Tortious Conduct of B.A.T. Industries p.l.c.
The Commonwealth alleges that B.A.T. Industries p.l.c. itself has engaged in the tortious conduct alleged in this lawsuit. B.A.T. Industries p.l.c. contends that the conduct of which the Commonwealth complains is conduct of various subsidiaries, not the conduct of the parent holding company. In the absence of some agency relationship or facts sufficient to pierce the corporate veil of B.A.T. Industries p.l.c., defendant contends that the Commonwealth has no evidence of any wrongdoing committed directly by the holding company itself.[1]
To date, the Commonwealth has had access to documentary discovery from B.A.T. Industries p.l.c. in similar cases pending in other states. It has not had depositions of the people involved to flesh out the various notes and meeting minutes it has seen, but must resort to inference to show that those notes and minutes reflect an express directive by B.A.T. Industries p.l.c. with respect to at least some of the tortious conduct alleged in this case.
The documents are sufficient to make out a prima facie case against B.A.T. Industries p.l.c. for its own express instructions to its subsidiaries on the subject of the allegedly misleading position they were to take on the issue of smoking and health. The documents reflect that, in 1984 and again in 1993, B.A.T. Industries p.l.c. issued a written policy requiring its subsidiaries to take the public position that a causal connection between cigarette smoking and disease had “not been proved” and that the subject of the dangers of cigarette smoking was a matter of “genuine scientific controversy.”[2] This directive came from B.A.T. Industries p.l.c. itself, attached to its company-wide “Statement of Business Conduct.”[3] This position was required of all B.A.T. Industries p.l.c. tobacco subsidiaries (including B&W), as well as by the subsidiaries in nontobacco enterprises.
The documents also reveal that the issue of “smoking and health” was a topic of regular discussion at various meetings and conferences that B.A.T. Industries p.l.c. had with representatives of its tobacco subsidiaries. The Chairman of the Board of B.A.T. Industries p.l.c. held annual “Chairman’s Advisory Conferences” attended by high-ranking representatives of the tobacco operating groups. The Chairman set the agenda for each of these conferences. From the minutes, and from preliminary correspondence in preparation for these conferences, it is apparent that the problem of the industry’s response to allegations about the dangers of its product was a prominent and recurring subject of the conferences. The Chairman began each conference with his own address (which was presumably related to the primary topic on the agenda), and it may be inferred that he participated in the rest of each meeting.
The same subject was a recurring theme in the meetings of the Tobacco Strategy Review Team (‘TSRT”), a group headed by the B.A.T. Industries p.l.c. Chairman of the Board. Originally, the TSRT members were other Board members plus representatives of BATCo (the principal research and development arm of the overall enterprise). Later on, the membership of TSRT expanded to include other heads of tobacco operations. Among the objectives of the TSRT was to ensure “that there is a unified approach on Smoking Issues.” The TSRT became another forum in which the Chairman communicated the B.A.T. Industries p.l.c. official position that there was a lack of scientific evidence linking smoking to disease.[4]
The Commonwealth has made a sufficient prima facie showing that the B.A.T. Industries p.l.c. subsidiaries were not free to articulate their own positions on the subject of smoking and health. On this issue, they were required to present the position dictated by B.A.T. Industries p.l.c., le., a misleading position that the health risks of cigarette smoking had “not been proved.” While the Commonwealth’s argument is based on snippets from B.A.T. Industries p.l.c., TSRT and Chairman’s Advisory Conferences documents (some of which are ambiguous as to whether B.A.T. Industries p.l.c. was “directing” that something be done or merely being kept informed of its subsidiaries’ activities), the context supports the Commonwealth’s interpretation.
The allegations that cigarette smoking causes serious disease and premature death in a significant percentage of smokers have, from the time those allegations first arose, posed a problem of paramount concern to the tobacco industry. Those allegations presented the industry with a serious and complicated challenge, and it would not be an exaggeration to state that the future of the entire industry depended on how it responded to that challenge. One would not expect the B.A.T. Industries p.l.c. subsidiaries to keep their “autonomy” on a subject so sensitive, so critical to the survival of the industry, and so difficult to handle.[5] Rather, it is to be expected that direction on how to combat these serious and widespread allegations about the health risks of their product would come from the very top of the corporate hierarchy, i.e„ from B.A.T. Industries p.l.c. The Statement of Business Conduct and attached policy on smoking and health (which indisputably emanated from B.A.T. Industries p.l.c. itself) set a specific position that the subsidiaries were to adopt for public consumption, and it is reasonable to infer that the same message was refined, repeated and reinforced at the numerous TSRT meetings and Chairman’s Advisory Conferences devoted to the same problem. Where the Chairman of B.A.T. Industries p.l.c. convened many meetings directed at this crucial issue, and listened to hours of presentation and debate on the subject, it strains credulity to suggest that he then said nothing as to what B.A.T. Industries p.l.c. wanted them to do about this threat to the continued viability of their business. For purposes of the present motion, the Commonwealth has *237 made a sufficient showing that the allegedly misleading and deceptive position taken by B&W was the product of express directives from B.A.T. Industries p.l.c.
The documentary evidence submitted with respect to the Commonwealth’s other claims against B.A.T. Industries p.l.c. is somewhat ambiguous. There is evidence that B.A.T. Industries p.l.c. was kept informed of subsidiaries’ activities in the areas of ammonia treatment (and its effect of enhancing delivery of nicotine to the smoker) and development of high-nicotine tobacco. Lacking, at least from the documentary evidence to date, is any clear indication that B.A.T. Industries p.l.c. mandated or directed that its subsidiaries pursue these projects.
With regard to development of “safer” cigarettes, the documents do reflect an instance where a Canadian subsidiary sought funding and approval for such work. After discussing the issue at a TSRT meeting, the decision not to approve the project was communicated in writing by the Chairman of B.A.T. Industries p.l.c. The reasons given for not going forward with work on a “safer” cigarette overlapped with the previously articulated B.A.T. Industries p.l.c. concern about maintaining a unified position that the health risks of smoking had not been proved: “(I]n attempting to develop a ‘safe’ cigarette you are, by implication in danger of being interpreted as accepting that the current product is ‘unsafe’ and this is not a position that I think we should take.” Rather, the Chairman explained, “(t]he BAT objective is and should be to make the whole subject of smoking acceptable to the authorities and the public at large since this is the real challenge facing the Industry.” (Emphasis in original.) Although the letter disapproving the proposed “safer” cigarette research came from the Chairman of B.A.T. Industries p.l.c., the underlying TSRT minutes show that BATCo was already opposed to the project and that the Chairman was reiterating the view of BATCo in his letter disapproving the proposal. This incident shows that the issue of “safer” cigarette research was raised with B.A.T. Industries p.l.c. itself and that B.A.T. Industries p.l.c., following the advice of its principal research subsidiary, disapproved of the project. From the TSRT discussion of the subject of “safer” cigarette research, the tobacco subsidiaries would have understood that B.A.T. Industries p.l.c. would not look favorably on such projects. It is not certain that this would be interpreted as a “mandate” or “directive” that such research not be done, but it probably would be so interpreted, particularly where B.A.T. Industries p.l.c. had stated that such research was contrary to the company’s previously mandated position on smoking and health issues.[6]
Discussion
In order to assert jurisdiction over a foreign defendant, plaintiff must make a prima fade showing that 1) the Massachusetts long-arm statute (G.L.c. 223A, §3) has been satisfied and 2) that the assertion of jurisdiction over the defendant would not offend due process. Tatro v. Manor Care, Inc., 416 Mass. 763, 767 (1994), citing Good Hope Industries, Inc. v. Ryder Scott Co., 378 Mass. 1, 5-6 (1979).
I. Massachusetts Long-Arm Statute
The Commonwealth contends that various subsections of the state’s long-arm statute have been satisfied as to B.A.T. Industries p.l.c. The court is satisfied that the Commonwealth has made the requisite showing under §3(d). Under §3(d), the court has personal jurisdiction over:
a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person’s . . . causing tortious injuiy in this commonwealth by an act or omission outside this commonwealth if he [1] regularly does or solicits business, or [2] engages in any other persistent course of conduct, or [3] derives substantial revenue from goods used or consumed or services rendered, in this commonwealth.
The Commonwealth alleges that B.A.T. Industries p.l.c. itself committed acts outside the state that caused tortious injuiy (disease from cigarette smoking and accompanying increased Medicaid costs to treat that disease) in the state. As discussed above, the Commonwealth has made a prima facie showing of allegedly tortious conduct by B.A.T. Industries p.l.c. itself, at least with respect to the allegedly misleading and deceptive information about the health risks of smoking and the decision not to develop “safer” cigarettes. Those acts were committed by B.A.T. Industries p.l.c. “directly,” and the cause of action arises out of in-state injuiy allegedly stemming from those tortious acts out of state.
The Commonwealth must next show that B.A.T. Industries p.l.c. either “regularly does or solicits business” in Massachusetts, or “engages in any other persistent course of conduct” in Massachusetts, or “derives substantial revenue from goods used or consumed or services rendered" in Massachusetts. The Court is satisfied that the Commonwealth has shown derivation of “substantial revenue” from Massachusetts sales, and thus this sub-part of §3(d) is satisfied.
The Commonwealth estimates that B.A.T. Industries p.l.c. has received something on the order of $1 billion from B&Ws cigarette sales in Massachusetts over the last fifteen years. B.A.T. Industries p.l.c. does not dispute that it reaps substantial dividends from B&W and that those dividends derive in part from B&Ws Massachusetts sales, but it contends that the receipt of corporate dividends can not be the equivalent of “deriv[ingl substantial revenue from goods used or consumed” in Massachusetts.
Revenue from Massachusetts sales does not have to be received directly by the defendant in order to satisfy this subsection of the long-arm statute. Sales *238 proceeds filtered back through corporate channels are sufficient to meet the literal requirements of the statute. Heins v. Wilhelm Loh Wetzler Optical Machinery GmbH & Co. KG., 26 Mass.App.Ct. 14, 20-21 (1988). In Heins, a West German manufacturer of optical machinery sold its product outright to a Swiss corporation, which in turn sold the machines in the United States through a distributor incorporated in Illinois. A Massachusetts worker injured by one of the machines sued the West German manufacturer in Massachusetts. The defendant conceded that there were proceeds from sales in Massachusetts, but argued that “it is shielded from attribution of that revenue by its arrangements with [the Swiss corporation].” Id. at 21 n.5. A Justice of the Superior Court agreed and granted the manufacturer’s motion to dismiss for lack of personal jurisdiction. The Appeals Court reversed, opining that “[ljiteral satisfaction” of the “derives substantial revenue” requirement was all that was necessary, and that defendant’s argument about its corporate arrangements “ignores economic reality and, for purposes of statutory construction, elevates form over substance.” Id. at 20.[7]
This court is bound by Heins. The question whether B.A.T. Industries p.l.c. “derives substantial revenue from goods used or consumed” in Massachusetts does not depend on its corporate arrangements. This requirement of the long-arm statute is satisfied if significant revenue from Massachusetts sales makes its way back to B.A.T. Industries p.l.c. The details of the corporate channels through which the funds are transmitted are not of importance. In Heins, the record did not even reflect how sales proceeds received by the Illinois distributor were shared with or passed through to the Swiss corporation, nor did it set forth what the arrangement was between the Swiss corporation and the defendant manufacturer. When, how and on what basis the manufacturer got paid were not specified— i.e., the contractual or corporate arrangements by which the manufacturer benefitted from Massachusetts sales was not necessary to the inquiry. If the “economic reality” was that the manufacturer benefit-ted from sales in Massachusetts, the manufacturer “derived substantial revenue” from Massachusetts. Here, the “economic reality” is that B.A.T. Industries p.l.c. obtains substantial dividends from its subsidiary on account of sales of goods in Massachusetts.[8] Their corporate arrangements notwithstanding, that means that B.A.T. Industries p.l.c. derives substantial revenues from goods used or consumed in Massachusetts.
B.A.T. Industries p.l.c. attempts to distinguish Heins on the ground that the defendant in Heins was the manufacturer of the product in question. Nothing in Heins itself, and certainly nothing in the long-arm statute, suggests that the statutory requirement is different for a manufacturer as opposed to some other entity. For this piece of the long-arm statute, the issue is whether a defendant “derives substantial revenue from goods used or consumed” in Massachusetts, not what role it has with respect to those goods.
B.A.T. Industries p.l.c. also argues that this interpretation of §3(d) would overturn the principles of corporate law and strip holding companies of their limited liability. It has no such effect. The issue under the long-arm statute is whether B.A.T. Industries p.l.c. may be sued in this forum. Nothing in the long-arm statute creates or expands liability, and the assertion of jurisdiction over B.A.T. Industries p.l.c. does not make B.A.T. Industries p.l.c. liable for the acts of its subsidiaries. The court is merely deciding whether B.A.T. Industries p.l.c. may be sued in this state for what it itself has allegedly done. For purposes of deciding where a corporation may be sued, the “deriv[ation] of revenue” component of the long-arm statute may include revenue obtained indirectly via subsidiaries without thereby making the foreign parent liable for the acts of its subsidiaries.
Thus, the Commonwealth has made the requisite primafacie showing to satisfy §3(d).[9]
II. Due Process
Once the literal requirements of the long-arm statute have been met, the court must separately determine whether the forum state’s assertion of jurisdiction over the defendant would comport with due process. To satisfy due process requirements, plaintiff must show that defendant has “minimum contacts” with the state and that the exercise of jurisdiction will not offend “traditional notions of fair play and substantial justice.” Tatro v. Manor Care, Inc., 416 Mass. 763, 772-73 (1994), citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) and International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).
A. Minimum Contacts
The “minimum contacts” requirement may be satisfied without showing any physical contact with the forum state if a defendant’s efforts are “purposefully directed toward residents of” the state. Burger King Corp., 471 U.S. at 476. With regard to intentional wrongs (as opposed to mere negligence), “minimum contacts” exist if the defendant’s misconduct was “aimed at” or “calculated to cause injury” in the forum state. Calder v. Jones, 465 U.S. 783, 789, 791 (1984).
In Calder, a California plaintiff brought suit in California alleging that she had been harmed by a libelous article appearing in the National Enquirer. The author and editor of the offending article resided in Florida and had no contact whatsoever with California. Although the magazine they worked for was circulated in California, the individual author and editor had no control over or involvement in the marketing and sale of the magazine. They argued that they therefore could not be subjected to jurisdiction in California. The argument was rejected. Where defendants knew that the effects of their alleged intentional *239 wrong would be felt in California, it did not offend due process to require them to answer for it in California.
B.A.T. Industries p.l.c. attempts to distinguish Colder on the ground that the defendants’ wrongdoing in that case was aimed at a specific plaintiff in one specific state. B.A.T. Industries p.l.c. thus contends that if its intentional wrongdoing was aimed at more than one state, the Colder “effects” test does not apply. While Colder presented an easier case involving only one state, its reasoning does not hinge on that fact. Rather, the analysis in Colder distinguishes intentional wrongdoing from negligent wrongdoing for purposes of assessing “minimum contacts.” Where the wrongdoer is committing an intentional tort, and knows where the effects of that intentional tort will be felt, it does not offend due process to hale that wrongdoer into court in the placets) where he knew his wrongdoing would cause injury.
Here, the Commonwealth alleges that B.A.T. Industries p.l.c. directed its subsidiaries (including B&W) to misrepresent the health risks of their products and deliberately prevented its subsidiaries from making those products “safer.” If B.A.T. Industries p.l.c. gave such directions to B&W and prevented B&W from developing a “safer” cigarette, it did so with actual knowledge that those misrepresentations would be made throughout the United States, including Massachusetts, and with actual knowledge that the unsafe products would be sold throughout the United States, including Massachusetts. The fact that the alleged intentional wrong was directed at many states instead of just one should not have the result that B.A.T. Industries p.l.c. can not be sued anywhere in the United States. Colder does not suggest such a result. Rather, under Colder, the fact that B.A.T. Industries p.l.c. aimed its alleged wrongdoing at the entire United States gives it the requisite “minimum contacts” with each state where that alleged intentional wrongdoing caused injury.[10]
The determination that B.A.T. Industries p.l.c. has the requisite minimum contacts with Massachusetts is bolstered by the substantial presence of its wholly-owned subsidiary in Massachusetts. It is undisputed that B&W has substantial contacts with this state. B&W sells products in Massachusetts, advertises in Massachusetts, has contracts with Massachusetts distributors, etc. B.A.T. Industries p.l.c. again argues that, unless the corporate veil can be pierced, the contacts B&W has with Massachusetts have no bearing on whether B.A.T. Industries p.l.c. has “minimum contacts” with the state. Principles involved in piercing the corporate veil, which are used to determine whether a parent corporation is liable for the wrongdoing of its subsidiary, are not the principles that govern the constitutional question of whether it comports with due process to sue the parent corporation in a particular forum for what the parent itself has done. See In re Telectronics Pacing Systems, Inc., 953 F.Sup. 909, 915-18 (S.D. Ohio 1977); Brunswick v. Suzuki Motor Co., 575 F.Sup. 1412, 1420-21 (E.D.Wis. 1983); Hoffman v. United Telecommunications, Inc., 575 F.Sup. 1463, 1470-72 (D.Kan. 1983), citing Energy Reserves Group, Inc. v. Superior Oil Co., 460 F.Sup. 483, 505-08 (D.Kan. 1978). Here, the Commonwealth alleges that B.A.T. Industries p.l.c. directed its subsidiary to commit the torts now complained of, with knowledge that the subsidiary would do so in this forum. The presence of B.A.T. Industries p.l.c.’s subsidiary in this forum committing torts allegedly mandated by B.A.T. Industries p.l.c. is a “contact” that B.A.T. Industries p.l.c. has with this forum, and the finding that there is such a “contact” does not depend on any piercing of the corporate veil.
B. Fair Play and Substantial Justice
On the issue of whether the exercise of jurisdiction would offend “traditional notions of fair play and substantial justice,” the court is to consider the reasonableness of the assertion of jurisdiction, “taking into account such factors as the burden on the defendant of litigating in the plaintiffs chosen forum, the forum State’s interest in adjudicating the dispute, and the plaintiffs interest in obtaining relief.” Tatro, 416 Mass. at 773.
The burden on B.A.T. Industries p.l.c. is not that great, despite its status as a London-based holding company. B.A.T. Industries p.l.c. has come to the United States and to Massachusetts on various occasions when it suited B.A.T. Industries p.l.c.’s financial interests. It has counsel here in Massachusetts, and counsel representing it elsewhere in the United States (where similar claims are being pursued against it) have been admitted pro hoc vice. B.A.T. Industries p.l.c. is not a small or impecunious defendant being required to incur the expense of litigation in a foreign country. It is a company of substantial resources with over 500 subsidiaries operating worldwide. B.A.T. Industries p.l.c. is no stranger to the rigors and expenses of international travel, and can certainly tolerate the burden of defending itself in Massachusetts without undue hardship. See Nowak v. Tak How Investments, Ltd. 94 F.3d 798, 718 (1st Cir. 1996).
On the other side of the equation, the forum state’s interest in adjudicating this dispute is high, and the plaintiffs interest in obtaining convenient and effective relief is high. The Attorney General seeks not only monetary recovery for the Medicaid expenditures allegedly caused by defendants’ wrongdoing’ but also injunctive relief to address the alleged public health problems associated with smoking. The other tobacco industry manufacturers and associations are being sued here, and jurisdiction over all the other defendants is uncontested. Requiring the Attorney General to bring a separate suit against B.A.T. Industries p.l.c. in the United Kingdom in order to obtain this relief is obviously burdensome in the extreme (as well as an enormous waste of judicial resources). A weighing of *240 the so-called “gestalt” factors comes out strongly in favor of plaintiff in this case. Accordingly, the court is satisfied that the assertion of jurisdiction over B.A.T. Industries p.l.c. in this case will not offend traditional notions of fair play and substantial justice.
ORDER
For the foregoing reasons, B.A.T. Industries p.l.c.’s Motion to Dismiss the First Amended Complaint for Lack of Personal Jurisdiction is DENIED.

 The Commonwealth has not made a prima facie showing on a theory of piercing the corporate veil. Much of the wrongdoing alleged is attributable to B&W and/or to British American Tobacco Company, Ltd. (“BATCo”), another subsidiary chiefly involved in research for all the tobacco subsidiaries. B.A.T. Industries p.l.c., BATCo and B&W are separate and distinct corporations, and the Commonwealth has not shown any failure to respect the separate nature of the corporate entities, any confused intermingling between the entities, or any serious ambiguity in the manner and capacity in which the entities acted. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968). Many of the intra-company documents use a confusing terminology, primarily by resorting to the ambiguous acronym “BAT” without specifying whether they are referring to BATCo or to B.A.T. Industries, p.l.c., but those documents were not for public consumption. The terminology used in the documents complicates the present task of determining which BAT-related entity is being referred to in a particular document, but they do not provide a basis for piercing the corporate veil.
The court also agrees that B&W was not, in its everyday business, acting as an agent of B.A.T. Industries p.l.c. such that all of B&Ws actions should be viewed as undertaken “on behalf of’ B.AT. Industries p.l.c. In most respects, B&W was allowed to function with autonomy. It was not under any form of day-to-day direct supervision by its parent that would make it the agent of the parent corporation.

 There is evidence to show that, at the times B.A.T. Industries p.l.c. gave this directive, it knew that the scientific community (and its own intra-corporate scientists) were convinced that the causal relationship between smoking and disease had long since been established and that the subject was not a matter of any “scientific controversy.” While, absent an agency relationship or piercing the corporate veil, the court may not attribute to B.A.T. Industries p.l.c. what its subsidiaries did, it may impute to B.AT. Industries p.l.c. the knowledge that its subsidiaries had on these matters.

 B.A.T. Industries p.l.c. points out that the policy directive told subsidiaries to be “factually and scientifically correct” in any public statements they made about smoking and health. In context, however, BA.T. Industries p.l.c. was simultaneously telling the subsidiaries what they were to say on that subject. B.A.T. Industries p.l.c. did not leave it up to the subsidiaries to determine what position would be “factually and scientifically correct.”

 B.A.T. Industries p.l.c. argues that the setting of these policies and communicating them to the subsidiaries can not form the basis of any claim against it because it is “normal” for a holding company to set overall policy for its subsidiaries and the communication of these policies went through “normal” corporate channels. The argument misses the point. There is nothing tortious about a holding company setting policy for the companies it owns. However, if the policy that the holding company adopts is itself misleading, deceptive or otherwise tortious, the fact that it has a right to set policy does not insulate it from liability. Similarly, an instruction to a subsidiary to engage in misleading, deceptive or tortious conduct is itself tortious, notwithstanding the fact that “normal” channels of corporate communication were used in instructing the subsidiary to commit the tort.
B.A.T. Industries p.l.c. also argues that what was said at Chairman’s Advisory Conferences and TSRT meetings is irrelevant because those groups did not meet frequently enough to exert “day to day control” over the tobacco subsidiaries. Again, defendant is confusing agency and piercing the corporate veil concepts with the issue of what it itself did. The Chairman’s Advisory Conferences and TSRT meetings do not provide a basis for piercing the corporate veil or for holding that the tobacco subsidiaries were mere “agents” of the parent corporation. What they do provide is a basis for believing that the allegedly misleading and deceptive position taken by the tobacco subsidiaries was mandated by B.AT. Industries p.l.c. itself.

 The need for a consistent position on the issue of smoking and health was expressly recognized in a set of public affairs “Guidelines” issued by BATCo in 1982. (Although promulgated by BATCo, the Guidelines were distributed to the subsidiaries, including B&W, directly from B A.T. Industries p.l.c.) In the Guidelines, the subsidiaries were warned that “[t]he Tobacco Industry will only be able to defend itself adequately against attack if it presents a united response" and that “(i]t is essential that, on Smoking Issues, the industry speaks with one voice." In context, the Guidelines are actually referring to the need for the industry as a whole (including competitors) to present a “united response" and to speak “with one voice.” With that backdrop, subsidiaries certainly understood that they were not free to deviate from the public relations position crafted by B.A.T. Industries p.l.c.

 B.A.T. Industries p.l.c. contends that the Canadian subsidiary went ahead with some of this research anyway, without the funding it had been looking for. If so, further discovery should elucidate how far that research got and whether there was any reaction by B.AT. Industries p.l.c. when it learned that one of its subsidiaries was in fact conducting research into “safer” cigarettes.

 See also Hawes v. Honda Motor Co., 738 F.Sup. 1247, 1249-50 (E.D. Ark. 1990). In Hawes, an injured plaintiff sued the foreign designer of a Honda all-terrain vehicle. The designer was a wholly owned subsidiary of the foreign manufacturer, and the in-state distributor was another wholly-owned subsidiary of the manufacturer. The designer was “paid” upon delivery of production blueprints to the parent. It did not actually get any revenue from the later sales made by the distributor subsidiary in the forum state, and thus argued that it did not “derive substantial revenue from goods used” in the forum state. The court disagreed. Revenues from in-state sales went to “the Honda corporate family," and the designer “obviously enjoys the revenues received by the Honda family.” 738 F.Sup. at 1250. Where the designer subsidiary “lives through the total revenues generated by the parent through the operations of it and its subsidiaries," and those revenues included revenues derived from sales in the forum state, the court held that the designer subsidiary “derives substantial revenue from goods consumed” in the forum state.

 Although not necessary for purposes of satisfying the long-arm statute, the tortious acts allegedly committed by B.A.T. Industries p.l.c. would have the effect of increasing the dividends it received attributable to Massachusetts sales. If, as alleged here, a parent corporation instructs a subsidiary to make misrepresentation about its product, and due to those misrepresentations more product is sold in the forum state and higher dividend returns are received, it is troublesome to conclude that the parent can not be sued in the forum state simply because the tortiously enhanced revenues are transmitted to it via dividends.

 The court’s decision with respect to B.AT. Industries p.l.c. deriving substantial revenue from goods used or consumed in Massachusetts makes it unnecessary to decide *241 whether the alternative methods of satisfying §3{d) have also been shown. B.AT. Industries p.l.c. initially denied that it had ever conducted any form of business in Massachusetts. The Commonwealth has, from the limited discovery available to it, shown that B.AT. Industries p.l.c. representatives have in fact come to Massachusetts on various occasions for purposes of promoting investment in B.A.T. Industries p.l.c. While what has been shown to date would not amount to B.A.T. industries p.l.c. "regularly doting] or soliciting] business” or “engaging] in any other persistent course of conduct” in the Commonwealth, the court would allow further discovery on this issue before making a ruling on these alternative §3(d) theories. While B.AT. Industries p.l.c. protests that the Commonwealth has had ample access to extensive discovery by way of documents produced in other litigation around the country, discovery in other jurisdictions has had no reason to focus on activities in Massachusetts. Where there is, even without Massachusetts-directed discovery, some evidence of B.A.T. Industries p.l.c. activities within Massachusetts, the court would allow the Commonwealth discovery on BA.T. Industries p.l.c.’s Massachusetts activities before it would grant the motion to dismiss.

 The Commonwealth also argues that minimum contacts are present under a “stream of commerce” analysis. When a foreign defendant places product into the stream of commerce with the expectation that the product will ultimately be purchased in the forum state, that defendant may be sued in the forum state consistent with due process. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98 (1980). But see Asahi Metal Industries Co., Ltd. v. Superior Court of California, 480 U.S. 102 (1987). The “stream of commerce” analysis has also been extended to defendants who designed the product that was placed into the stream of commerce. See Wessinger v. Vetter Corp., 685 F.Sup. 769 (D.Kan. 1987); Warren v. Honda Motor Co. Ltd., 669 F.Sup. 365 (D.Utah 1987). Here, B.A.T. Industries p.l.c. has not itself manufactured or designed the products being placed into the stream of commerce. However, the Commonwealth has made a prima facie showing of direct involvement by B.A.T. Industries p.l.c. in the marketing of its subsidiaries’ products, in that it directed the subsidiaries to make misrepresentations concerning the health risks of their products. It has also made a prima facie showing that B.A.T. Industries p.l.c. prevented its subsidiaries from making a “safer” product. B.AT. Industries p.l.c. acted with knowledge that the deceptive marketing and the deceptively marketed unsafe products would be “swept by the stream of commerce” into Massachusetts. Thus, if the “stream of commerce” analysis extends to the marketing of products that are placed into the stream of commerce, the Commonwealth has also shown the requisite “minimum contacts” under this alternative theory. A deceptive marketing scheme that promotes a dangerous product being placed into the stream of commerce is analogous to providing a defective design for a product that someone else will place into the stream of commerce. The extension of the “stream of commerce" analysis to those involved in the marketing of dangerous products would be an appropriate extension.